**OREGON ENVIRONMENTAL COUNCIL; Citizens For the Safe Control of the Gypsy Moth; Elaine Olsen and Glen Olsen, Plaintiffs,**

**and**

**Friends of the Earth; National Coalition Against the Misuse of Pesticides, Plaintiffs/Intervenors,**

**v.**

**Leonard KUNZMAN, Director, State of Oregon, Department of Agriculture, State of Oregon, Department of Agriculture; United States Department of Agriculture; John R. Block, Secretary, United States Department of Agriculture; et al., Defendants.**

**and**

**Oregonians For Food and Shelter, Inc., Defendants/Intervenors.**

**Civ. No. 82–504–RE.**

United States District Court, D. Oregon.

April 26, 1985.

Larry N. Sokol, Jolles, Sokol & Bernstein, P.C., Portland, Or., John E. Bonine, Michael D. Axline, Ralph Bradley, Bradley & Gordon, Eugene, Or., for plaintiffs and plaintiffs/intervenors.

Charles H. Turner, U.S. Atty., Thomas C. Lee, Asst. U.S. Atty., Portland, Or., Dorothy R. Burakreis, R.W. Rodrigues, Elizabeth Ann Peterson, Land and Natural Resources Div., General Litigation Section, U.S. Dept. of Justice, Washington, D.C., John DiLorenzo, Jr., Brendan Stocklin-Enright, DiLorenzo & Dietz, Portland, Or., for defendants and defendants/intervenors.

## OPINION

REDDEN, District Judge:

### BACKGROUND

Plaintiffs commenced this suit in Spring of 1982 seeking to enjoin the spraying of carbaryl over 6,400 acres in Salem, Oregon. The spraying was the crux of a program designed to eradicate gypsy moths discovered in that urban area. Plaintiffs alleged that the spray program violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332 (1976), the Administrative Procedure Act (APA), 5 U.S.C. §§ 702 and 706 (1976) and several other statutes or regulations.

After a trial on the merits I determined that the federal defendants had not violated NEPA. On appeal, the Ninth Circuit determined that the federal defendants had in fact violated NEPA by failing to prepare adequate site specific environmental statements. *Oregon Environmental Council v. Kunzman,* 714 F.2d 901, 905 (9th Cir. 1983).

On January 26, 1984, I issued a permanent injunction prohibiting federal defendants from implementing any program for aerial broadcast spraying of carbaryl in populated areas in Oregon until they prepared a legally adequate Environmental Impact Statement (EIS). On March 16, 1984, federal defendants issued a new Programmatic Environmental Impact Statement (PEIS) for gypsy moth eradication and suppression programs in the United States. Plaintiffs challenged the PEIS by filing a motion for a temporary restraining order, preliminary injunction and an order to show cause to prevent federal defendants from aerial broadcast spraying anywhere in the United States pursuant to the March 16, 1984 PEIS. Plaintiffs alleged that the PEIS was legally deficient in a number of ways.

On May 3, 1984, Friends of the Earth, National Coalition Against the Misuse of Pesticides moved the court for an order allowing it to intervene in plaintiffs' motion. I granted the motion on the same day. Following a number of postponement requests by both sides, a final hearing date was set for September 25, 1984. A pretrial conference was scheduled for August 31, 1984.

On August 20, 1984, the government withdrew the contested PEIS, issuing its intent to supplement it. At the pretrial

conference the government informed the court that it would have a draft supplement for public review by November 1, 1984. The draft supplement was not made available to the public, however, until December 29, 1984. A 45 day comment period followed the issuance, after which the government began preparation of the final EIS as supplemented.

On March 1, 1985, Oregonians for Food and Shelter, Inc. moved the court for an order granting it permission to intervene on behalf of defendants. That motion was granted on March 29, 1985. Meanwhile, the final Environmental Impact Statement (FEIS) as Supplemented (FEIS), for the eradication and suppression of gypsy moths was filed on March 23, 1985.

Plaintiffs challenged the adequacy of the FEIS on numerous grounds and a trial on the merits was held April 16–18, 1985. For the reasons set forth below I enjoin the use of carbaryl, trichlorofon, acephate and diflubenzuron in Oregon effective this date, and enjoin the use of the same synthetic chemical sprays elsewhere in the United States effective January 1, 1986. The use of Bacillus thuringiensis (B.t.) is not enjoined in Oregon or elsewhere in any program based upon the current Final Environmental Impact Statement as Supplemented, 1985.

At trial plaintiffs alleged that they were precluded from commenting on the FEIS's worst case analysis (WCA) because it was "tacked on" to the March 1984 PEIS at the last minute. Plaintiffs further challenged the WCA on the grounds that it did not mention that diflubenzuron might cause cancer, or that children and chemically sensitive persons would be adversely affected by the use of the synthetic pesticides discussed in the FEIS. Plaintiffs also contended that the WCA did not consider the expected synergistic or cumulative effects of the synthetic pesticides and other toxic agents in the environment. Additionally, plaintiffs alleged, the WCA underestimates the period the synthetic pesticides remain in the environment and their absorption rates.

Plaintiffs also criticized the use of acceptable daily intake (ADI) and no observable effect level (NOEL) figures in computing health risks to humans. Plaintiffs also argued that defendants failed to fill "data gaps" as statutorily required and that the alternatives to synthetic pesticides were buried in the body of the FEIS. Plaintiffs also challenged the FEIS on the ground that it does not give a total estimate of the number of people that might develop cancer as a result of spraying the synthetic pesticides discussed. Finally, plaintiffs contend that the FEIS fails to meet the regulatory requirements of brevity and clarity.

The PEIS was withdrawn in August 1984 and from then to the present, federal defendants have contended that the court lacks jurisdiction to review the EIS in any form because there is no final agency action.

### A. *NEPA's Requirements and Purpose*

Section 102(2)(c) of NEPA requires the preparation of an EIS whenever "major Federal actions significantly affecting the quality of the human environment" are undertaken. Clauses (i) through (v) specify the content of the EIS and establish the adequacy requirement. These requirements are expanded and defined by regulations promulgated by the Council on Environmental Quality (CEQ). The CEQ is an agency established by Title II of NEPA for the purpose of promulgating advisory rules and regulations and to review and evaluate federal programs.

Although the CEQ is advisory in nature, federal courts have accorded it great deference. *Environmental Defense Fund, Inc. v. Hoffman*, 566 F.2d 1060 (8th Cir.1977); *Silentman v. Federal Power Commission*, 566 F.2d 237 (D.C.Cir.1977); *State of Alaska v. Carter*, 462 F.Supp. 1155 (D.Alaska 1978).

The CEQ regulations state that the purpose of an EIS is to serve as an action forcing device to insure that the policies and goals of the Act are infused into ongoing and proposed federal programs. An

EIS is to provide a "full and fair discussion of significant environmental impacts" and inform the public, as well as decisionmakers, of available alternatives which would avoid or minimize adverse effects. An EIS is to inform the public and decisionmakers, in clear and succinct language, of proposed federal action, the harms and health risks associated with the proposed actions, and any reasonable alternatives.

B. *Standard of Review*

■ NEPA does not expressly provide for judicial review of agency actions but the APA does. Also, courts have uniformly held that judicial review of agency decisions is implied by NEPA. *Calvert Cliffs Coordinating Committee, Inc. v. United States Atomic Energy Commission,* 449 F.2d 1109 (D.C.Cir.1971); *Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army,* 470 F.2d 289 (8th Cir.1972), *cert. denied,* 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973). When a FEIS is filed it is subject to judicial review for compliance with NEPA.

The adequacy of an EIS depends upon whether it was prepared in observance of the procedures required by NEPA, 5 U.S.C. § 706(2)(D). *See also, Lathan v. Brinegar,* 506 F.2d 677, 693 (9th Cir.1974) (en banc). Under this standard of review, courts employ a "rule of reason" that inquires whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences. *Trout Unlimited, Inc. v. Morton,* 509 F.2d 1276, 1283 (9th Cir.1974). Although this is a flexible standard not readily susceptible to a precise definition, several courts have attempted to explain it.

In *Silva v. Lynn II,* 482 F.2d 1282 (1st Cir.1973), the court held that the impact statement must allow the court to determine whether the agency made a "good faith effort" to take environmental values into account. To meet this requirement the impact statement must fully explain its inquiry, analysis and reasoning.

The Court in *Warm Springs Dam Task Force v. Gribble,* 565 F.2d 549 (9th Cir. 1977), requires the reviewing court to make a pragmatic judgment as to whether the EIS's form, content and preparation fostered both informed decisionmaking and informed public participation.

The Second Circuit explains these two approaches in *Sierra Club v. United States Army Corps of Engineers,* 701 F.2d 1011, 1029 (2nd Cir.1983). The Court said:

[t]he ... [impact statement] must set forth sufficient information for the general public to make an informed evaluation, ... and for the decisionmaker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action ... [the impact statement gives] assurance that the stubborn problems or serious criticisms have not been swept under the rug.

The courts usually refer to the duty to prepare an adequate impact statement as the agency's "procedural" duty to comply with NEPA. The agency must comply with NEPA's procedures to insure the EIS contains an adequate analysis for the public and decisionmakers.

I am limited to reviewing the agency's procedural duty and may not substitute my judgment for that of the agency concerning the wisdom or prudence of the proposed programs. *California v. Block,* 690 F.2d 753, 761 (9th Cir.1982). Once satisfied that the agency has taken a "hard look" at the environmental consequences of the programs, I end my review. *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976).

C. *Jurisdiction*

Federal defendants assert that this court lacks jurisdiction to review the FEIS because there is no final agency action. Defendants argue that the FEIS was noticed in the Federal Register on March 15, 1985, and that there was no final agency action until 30 days after that pursuant to 40 C.F.R. § 1506.10. The trial on the adequacy of the FEIS commenced on April 16, 1985, more than 30 days after the FEIS

was noticed in the Federal Register. Moreover, 40 C.F.R. § 1500.3 specifically states:

It is the Council's intention that judicial review of agency compliance with these regulations not occur before an agency has *filed* the final environmental impact statement....

(Emphasis added).

The FEIS was filed on March 23, 1985. Thus, this court has jurisdiction over this case as the agency's action was final as of the date of the commencement of the trial.

D. *Plaintiffs' Substantive Challenges*

1. *No Comment Period for WCA*

Plaintiffs contend that the federal defendants "tacked on" the WCA at the last minute, precluding any public comment on it. This argument is without merit. The PEIS, including its WCA, was filed on March 23, 1984 and was subject to a 45 day public comment period which expired on May 7, 1984. 49 Federal Register 10,953.

Plaintiffs fail to state why they were precluded from commenting on the WCA during this 45 day period. Further, the draft supplement to the PEIS, released on December 29, 1984 subject to a 45 day comment period, also contained a WCA. I find that plaintiffs were given opportunity to comment. The plaintiffs do not prevail on this issue.

2. *Carcinogenicity of Diflubenzuron*

Plaintiffs contend that the federal defendants ignored the fact that the EPA has determined that 4-chloroaniline, a metabolite of diflubenzuron, is carcinogenic. Plaintiffs say that the omission of this discussion is misleading and renders the FEIS legally inadequate. Plaintiffs' contention is unfounded for two reasons.

First, the FEIS contains a discussion of the cancer risks associated with the ingestion of products which have been derived from animals exposed to diflubenzuron and thus contain various amounts of 4-chloroaniline. 64, F-12, F-21, F-83, F-84, G-21 at comment response kk. Diflubenzuron itself is noncarcinogenic.

Secondly, as was discussed by expert witnesses at trial, there is debate in the scientific community over whether 4-chloroaniline is in fact carcinogenic. The FEIS discusses 4-chloronailine in terms of its carcinogenicity. The plaintiffs' complaint that the FEIS does not alert the reader to the *known* carcinogenic risks associated with the use of diflubenzuron (through the ingestion of its metabolite 4-chloroaniline) stretches the disclosure requirements of NEPA too far.

3. *Children and Chemically Sensitive Individuals*

Plaintiffs argue that the FEIS fails to adequately discuss the risks of exposure to the synthetic pesticides to children and chemically sensitive individuals. Plaintiffs acknowledge that the FEIS includes a safety factor of ten to account for chemically sensitive persons, but argue that this factor is too low because such persons can be hundreds or thousands of times more sensitive than the general population.

A discussion of adverse health effects on chemically sensitive persons is included in Appendix F (WCA) of the FEIS at pages F–98–F–100.. The safety factors utilized in that discussion look into many biological factors such as age (young children and the elderly), sex, genetic composition and pre-existing illness. Page F–99 states

In order to account for possible impacts to sensitive individuals, the NOELS were reduced by an arbitrary safety factor of 100. ADIs already include a safety factor (100 in most cases) which was incorporated in part, to account for differential responses within the population. Although 100 is arbitrary it is based on a review of selected literature on variable human responses to foreign chemicals (xenobiotics) or diseases. (Citation omitted). Depending on the specific substance or disease, there was a 3.7–100 fold variation in response. However, 80–95% of the variation fell within a 10 fold factor.

At trial testimony was that the 5–20% of the sensitive population not falling within the ten fold factor fell on both sides of that

factor. Thus, not all persons outside of the ten fold factor had greater sensitivity; some had less. Also, there was no testimony or evidence that sensitive individuals exceed a 100 fold factor. Accordingly, the FEIS adequately discussed the potential risks to chemically sensitive persons, and plaintiffs fail in this contention.

### 4. *Synergistic and Cumulative Effects*

Plaintiffs claim the FEIS should not have attempted to discuss the synergistic effects of the four proposed synthetic pesticides in general terms because the actual effects are not yet known. Plaintiffs suggest that the FEIS should have concluded that "we do not know what health effects could occur as a result of synergism of these pesticides with other chemicals but will assume that such effects will occur in the worst case." Plaintiffs' trial memorandum, page 15.

█ The FEIS, as acknowledged by plaintiffs, contains a discussion of synergism at pages F–101—F–104. The FEIS discloses the fact that the actual synergistic effects of the synthetic pesticides with other chemicals are unknown and declines to suppose an effect. This is all that is required. Moreover, neither the statute nor its legislative history allows a court to substitute its judgment for that of the preparing agency as to the environmental consequences of the proposed actions. *Kleppe v. Sierra Club,* 427 U.S. at 421, 96 S.Ct. at 2735.

Plaintiffs further argue that the FEIS seriously underestimates the cumulative effects of repeated exposures to the proposed pesticides. At page F–103 of the FEIS there is a discussion of the cumulative effects of eating foods receiving multiple sprayings of the synthetic pesticides within a single season. Plaintiffs say this is inadequate because it does not take multiple direct exposures into consideration. At trial Dr. Schneeberger testified that the discussion of cumulative effects took into consideration not only the effects of eating foods which had been sprayed more than once, but also multiple direct exposures to the individual as well. Thus direct expo-

sure was taken into consideration and the document is adequate in discussing the cumulative exposure effects. Plaintiffs do not prevail on these issues.

### 5. *Absorption and Persistence Rates*

Plaintiffs argue that the calculations in the FEIS of the persistence and absorption of acephate on vegetables are overly optimistic. Page F–43 contains these calculations. Plaintiffs point to the estimate that only five percent of acephate residues will wash off vegetables after one day, due to absorption of the chemical. Plaintiffs agree with this estimate and state that the calculation at F–43 amounts to a 77% wash off of residues. In reaching this conclusion plaintiffs assumed that vegetables would have a residue of 50 parts per million, while the FEIS stated that only 4.0 to 11.4 parts per million remained after washing. At trial it was determined that vegetables will retain 4–15 parts per million of acephate and that the numbers in the FEIS were correct. (The 50 parts per million figure related to carbaryl residues, not acephate residues). This argument also fails, and I find the FEIS adequate on that issue.

Plaintiffs also argue that certain studies indicate that diflubenzuron and acephate may take considerably longer than the 14 days to degrade, the figure used by the FEIS. At trial defense witnesses explained why they did not rely on those studies in preparing the FEIS. They stated that the studies had been severely criticized because they had considered excessive use of the pesticides, and killed soil microorganisms necessary for the degradation process, or because the study conditions had been in controlled environments not representative of the actual environment.

I find that the agency's choice of studies on which to rely is within its discretion. I am precluded from reviewing such decisions unless I find them arbitrary or capricious. 5 U.S.C. § 706(2)(A). I find this decision to be reasonable, and plaintiffs fail on this issue.

### 6. *Use of ADIs and NOELs*

Plaintiffs contend that the FEIS stresses that NOEL and ADI figures indicate levels of safety and represent no risk situations for the environment and human health. At trial there was lengthy discussion about the use of these figures in assessing human health risks. These numbers are derived from animal studies and are therefore not truly correlative to human risks.

The FEIS defines a NOEL as the level of exposure of an experimental organism to a chemical, at which no adverse effects are observed. This figure does not mean that no adverse effects actually occur at that level, only that none are observed.

ADIs are defined in the FEIS as the maximum dose of a substance that is to be anticipated to be without lifetime risk to human health when taken daily. ADIs are established by dividing NOELs by a factor of ten to account for increased sensitivity of humans over the test animals used to establish the NOELs. These figures are then reduced another ten times to account for more sensitive humans. Thus, ADIs are typically 100 times lower than NOELs. At trial Drs. Richard Niesess and Richard Thomas testified that these values are routinely used in assessing human risks to chemical exposure and other environmental contaminants. No values are available for humans, because no medical or scientific research of this type has been done using humans as experimental models. Moreover, there was testimony that the use of these figures tend to overestimate associated risks to humans. Thus, the use of the figures to estimate human health risks is reasonable and does not render the document inadequate. Plaintiffs cannot prevail on this issue.

### 7. *Data Gaps*

Plaintiffs argue that defendants failed to conduct independent research to fill informational gaps as to negative effects of the proposed chemical sprays. 40 C.F.R. § 1502.22 provides that in evaluating adverse effects on the human environment where there are gaps in relevant information or scientific data, the agency must make it clear that such information is lacking, or that uncertainty exists. If the information relevant to adverse impacts is essential but not known, the agency must fill that gap by independent research. *Save Our Ecosystems v. Clark,* 747 F.2d 1240, 1249 (9th Cir.1984). An agency need not do independent research if the costs of doing the research are exhorbitant or the research means are beyond the state of the art. 40 C.F.R. § 1502.22.

Plaintiffs argue that defendants have ignored this mandate by providing no basis for measuring the costs of research, ignoring human health risks in considering what costs are exhorbitant, and claiming resolution of scientific uncertainty is beyond the state of the art.

The FEIS contains extensive bibliographies at pages 85-97 and F-105-F-113. Page F-7 lists numerous data bases which were searched by the agency in gathering information for the preparation of the FEIS. Several witnesses testified at trial that there are "data gaps" in the relevant information. The research needed to fill these gaps would take many years and require great expense to complete. Scientific studies, in order to be accurate and trustworthy, must be painstakingly performed, repeated and peer reviewed. This process takes many years to complete.

The data on the possible human health effects of these synthetic pesticides were not available to the agency, and could not have been obtained by it either through literature searches or independent research. Accordingly, it was reasonable for the agency to prepare a worst case analysis.

Plaintiffs suggest that the agency compute the total health care expenditures of all humans adversely effected by the programs instituted and compare that figure with the amount of money the government will expend to implement the programs, in order to determine if the costs of research are exhorbitant. This suggestion is illogical. Plaintiffs would require the agency to determine health care costs for health ef-

fects presently unknown. That is, the agency would have to have available to it all the scientific data that plaintiffs insist it must research. Plaintiffs do not prevail on this issue.

### 8. *Alternatives Buried*

Plaintiffs contend that alternatives to chemical spraying have been buried in the body of the FEIS and thus suggest to decisionmakers that none exist. This challenge to the adequacy of the FEIS is without merit. Alternatives to chemical spraying are discussed in the FEIS at pages ii, 9, 14, 15, 16, 20–24.

Other areas of controversy are also discussed throughout the document despite plaintiffs' contention that the worst case issues of cancer, mutations and birth defects are buried. The summary clearly identifies major concerns and issues associated with the proposed spraying programs. The first issue mentioned in the summary is human health. Also mentioned are the need for public involvement and education, environmental effects of certain insecticides and the need for the development of alternative suppression methods not involving chemical spraying. Both the summary and the text of the FEIS identify each of the four proposed synthetic insecticides and the cancer risks based on an individual's exposure to these compounds. Pages vi, vii, 58, 61, 64, 67, table 17, page F–133. *See also* tables 8–11, pages F–123–126. I do not agree that these alternatives are buried and that the FEIS is therefore invalid.

### 9. *No Estimation of Total Cancer Victims*

Plaintiffs assert that the FEIS must contain an estimate of the total number of persons expected to develop cancer as a result of the proposed spraying programs. Plaintiffs state that the FEIS contains no such estimate and is therefore illegally inadequate. Plaintiffs cite no authority for this proposition, but argue that, in their opinion, such an estimated figure is necessary. I do not find the FEIS inadequate for this reason. On pages F–95 and F–96 the FEIS discusses the estimated incidences of cancer assuming that all people living in a treated area will receive the highest estimated exposure. These figures were obtained by using data collected during the previous four years of spraying for gypsy moth suppression and eradication. Pages F–76 through F–84 contain the formulas and equations necessary for calculating this risk. These equations take into account exposure through spraying, dietary sources (both from insecticide on food directly, and from insecticide ingested by animals which are later eaten by humans), watershed, soil concentration and worker exposure. The equations also consider double exposure risks, i.e., direct exposure from spraying or working and dietary exposure.

Plaintiffs' argument that the FEIS must go beyond these calculations and set an overall specific estimated number of cancer victims is unreasonable for two reasons. First, the FEIS is intended to outline the risks associated with the particular chemicals. The FEIS is then to be supplemented by environmental assessments (EAs) from the individual state agencies that intend to use the chemicals for gypsy moth suppression. The EAs are to correlate the risks set out in the FEIS to the specific areas to be sprayed in the particular state. The FEIS cannot estimate the total number of human exposures without the EAs from the particular states. Any overall number otherwise reported would be conjectural.

Secondly, the FEIS clearly states that 14 states anticipate participation in the federal spraying program. It is unreasonable to require a figure of cancer incidences on a *nationwide* basis. "Common sense ... teaches us that the 'detailed statement' ... cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978).

### 10. *Clarity of FEIS*

40 C.F.R. §§ 1502.1 and 1502.2(b) state that the information in an EIS must be

"concise, clear and to the point" and that statements should be "analytic rather than encyclopedic." Section 1502.8 further states that the document should be written in "plain language so that decisionmakers and the public can *readily understand them.*" (Emphasis added). Plaintiffs assert that the FEIS is highly technical, esoteric and incomprehensible not only to the general public and majority of decisionmakers, but also to readers with advanced scientific backgrounds. I agree with plaintiffs that the WCA does not meet the regulatory mandate of clarity.

A thorough search of the case law and relevant literature has failed to produce any precedent or discussion regarding the "readability" of an EIS. Mention has been made in a few cases of the requirement of understandability in § 1502.8. However, no court has ever invalidated an EIS on the grounds that the document was not "readily understand[able]" by the public and decisionmakers.

I find that the text of the FEIS (pages i–78), although technical does meet the requirements of § 1502.8. That portion of the document discusses six alternatives for the control of the gypsy moth: the four synthetic pesticides, B.t. and integrated pest management. The environmental consequences of each are discussed in clear language. Full disclosure of the consequences of each alternative is in the text. Also included is mention of the fact that more research is needed on the human health risks posed by the use of the four synthetic pesticides.

As stated, because relevant information on the health risks of these pesticides is lacking, the agency is required to include a "worst case analysis" in the FEIS pursuant to 40 C.F.R. § 1502.22(b). The FEIS contains such an analysis in Appendix F. While the regulations do not specifically state that a worst case analysis is subject to the "understandability" standard of § 1502.8, I find that it is. A worst case analysis is an integral and important facet of an EIS. It is designed to alert the public and the decisionmakers of potential

health hazards and the probability of their occurrence. Unless the public and the decisionmakers are able to understand a worst case analysis, it is impossible for them to be aware of the potential risks.

In the present case, the worst case analysis contained in Appendix F of the FEIS is hypertechnical, complex and replete with lengthy equations and calculations. When asked to interpret a portion of the worst case analysis, defense witness Dr. Richard Wilson, Chairman of the Department of Physics at Harvard University, stated that he was unable to decipher the precise meaning of the passage, but given 15 minutes of study he could probably untangle the message. This testimony illustrates the complexity of this portion of the document.

I find that the worst case analysis does not meet the requirements of § 1502.8. Although the worst case analysis contains all the necessary information, it fails to communicate that to the persons entitled to be so informed. "An environmental impact statement is more than a disclosure document." 40 C.F.R. § 1502.1. An EIS must translate technical data into terms that render it an effective disclosure of the environmental impacts of a proposed project to *all* of its intended readership. *Natural Resources Defense Council v. United States Nuclear Regulatory Commission,* 685 F.2d 459, 487 n. 149 (D.C.Cir.1982), rev'd on other grounds sub nom. *Baltimore Gas & Electric Co. v. NRDC,* 462 U.S. 87, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). *See also, Warm Springs Dam Task Force v. Gribble,* 378 F.Supp. 240, 252 (N.D.Cal.1974) (main text of EIS clear, concise and easily readable). *Sierra Club v. Froehlke,* 359 F.Supp. 1289, 1343 n. 215 (S.D.Tex.1973) rev'd on other grounds sub. nom. *Sierra Club v. Callaway,* 499 F.2d 982 (5th Cir. 1982) (federal agencies must screen EIS for words not understandable to average person).

Therefore, the worst case analysis is legally inadequate and cannot be relied upon for the spraying of the four synthetic pesticides. The other two alternatives, B.t. and

integrated pest management, are not covered in the worst case analysis, nor need they be. The use of these alternatives is fully covered in the main text of the FEIS, which I have determined legally adequate.

E. *Remedies*

The main text of the FEIS is legally sufficient, but the worst case analysis is legally insufficient. I now must determine the appropriate remedy. An adequate worst case analysis is required before any of the four synthetic pesticides can be used in the eradication or suppression of gypsy moths. I therefore enjoin the use of the synthetic pesticides carbaryl, trichlorofon, acephate and diflubenzuron. I do, however, delay the injunction for two reasons.

At close of trial I asked plaintiffs specifically what relief they sought, should I determine the FEIS inadequate. Plaintiffs requested an injunction in Oregon, commencing immediately, prohibiting the use of the four synthetic pesticides. They also asked for a nationwide injunction to commence January 1986.[1] I grant their request.

The Oregon spraying program has been approved and the federal government has agreed to contribute dollars for its implementation. That program does not envision the use of chemicals. Rather, it has long been decided that B.t. will be used. I have earlier ordered that the Oregon program can, therefore, proceed as planned.

I impose a delayed *nationwide* injunction because it is the plaintiffs' requested remedy and because the imposition of an injunction on the eve of national spraying of gypsy moths would result in more damage to the environment than allowing the use of the chemical spraying. The Ninth Circuit has firmly stated that an injunction may be modified or denied altogether if the court determines more harm to the environment would result with the imposition of the injunction. *American Motorcyclist Association v. Watt*, 714 F.2d 962 (9th Cir.1983). *See also, Alpine Lake Protection Society v. Schlapfer*, 518 F.2d 1089

(9th Cir.1975). The FEIS makes it clear that many states are heavily infested with gypsy moths and the use of the synthetic pesticides is necessary to control these infestations. If not challenged, the moths would destroy the foliage on millions of acres of hardwood forests in the eastern United States. Although B.t. is the treatment of choice in Oregon, *see* FEIS pages 3, 10, we do not know that it is elsewhere, and we do not even know if B.t. is available elsewhere. Therefore, the nationwide injunction will go into effect following the spraying season, which, on balance, seems the soundest decision in aid of a healthy environment.

## CONCLUSION

■ The main text of the FEIS is legally adequate, but the worst case analysis fails to meet the requirements of 40 C.F.R. § 1502.8 and is inadequate. For the reasons above stated, I enjoin the use of carbaryl, trichlorofon, acephate and diflubenzuron commencing immediately in Oregon, and after January 1, 1986 on a nationwide basis.

## APPENDIX A

MR. SOKOL: I want to address what you have asked us about before lunch: What sort of remedy is appropriate for the Court to fashion. I will do so briefly, Your Honor.

Under 5 U.S.C. Section 702 it provides as follows:

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

Now, our reading of that statute and our interpretation is this: When we first went through this case, Your Honor, starting in 1982 and ultimately the Ninth Circuit Court of Appeals concluded that the environmental impact statement was legally inade-

---

**1.** A portion of the trial transcript of Thursday, April 18, 1985, in which plaintiffs' counsel out-

lines their remedy request, is attached hereto as Appendix A.

quate, we have had several conferences with Your Honor on the phone and discussions back and forth. At that time, we thought we were entitled and felt we wished a national injunction because the environmental impact statement had been adjudged legally inadequate.

. . . . .

So Your Honor does have, I think respectfully some discretion in deciding whether to entertain and to issue an injunction, a national injunction or a more limited statewide injunction and the Court injunction was to the state. Subsequently I think the only thing that has changed is the Court decision in *Merrill v. Block.* In *Merrill v. Block,* the Ninth Circuit Court of Appeals, we were seeking—and I can have my co-counsel talk about this since he was the appellate counsel in that case—we were seeking a ruling which we achieved in the Ninth Circuit that if the environmental impact statement is legally inadequate, the Court does not have discretion to do less than the plaintiffs are seeking because under the provisions of 5 U.S.C. Section 702, we read that to mean that we have some input in what remedy the Court is going to provide, what remedy we are seeking.

And the only thing that *Merrill* says according to our interpretation is that the Court is not empowered in its discretion because Congress had divided power among the courts and the Congress. The courts do not have power to enter less of an injunction if the document is inadequate and less than the parties are seeking.

In this case, we are seeking a statewide expansion of the injunction that Your Honor entered on January 24th, I believe it was, in 1984, to include the three synthetic pesticides because we believe, Your Honor, we have proven in court that the environmental impact statement is overwhelmingly and legally inadequate.

An alternate remedy I will present to the Court is the possibility of a national injunction to be entered to commence January 1986, giving the Government time to decide in this case whether or not to enter an appeal or whether to rewrite the environ-

mental document or what remedy they wish to seek.

And the advantage of that which we talked about was that it would allow the states to go forward with whatever programs outside of Oregon which were available and at the same time make the provision known that it was a one-time occurrence and subsequently additional action would have to be taken.