673 F.Supp. 1019 (1987)
NORTHWEST COALITION FOR ALTERNATIVES TO PESTICIDES; Oregon Environmental Council; Audubon Society of Portland, Plaintiffs,
v.
Richard E. LYNG,[1] Secretary, United States Department of Agriculture, et al.; Donald Paul Hodel, Secretary, United States Department of the Interior, et al., Defendants,
and
Oregonians for Food and Shelter, Intervenor/Defendants.
Civ. No. 83-6272-BU.
United States District Court, D. Oregon.
November 24, 1987.
*1020 *1021 Ralph A. Bradley, Bradley and Gordon, Eugene, Or., for plaintiffs.
Charles H. Turner, U.S. Atty., Thomas E. Lee, Asst. U.S. Atty., Portland, Or., Dorothy R. Burakreis, Allan D. Brock, U.S. Dept. of Justice, General Litigation Section, Land and Natural Resources Div., Washington, D.C., for Federal defendants.
John DiLorenzo, Jr., Moshofsky, DiLorenzo and Dietz, Portland, Or., for defendant/intervenor Oregonians for Food and Shelter, Inc.
JAMES M. BURNS, District Judge.

I. FACTS
On March 1, 1984, I enjoined the defendants from all spraying of herbicides within Region Six of the U.S. Forest Service and within the BLM Districts within the State of Oregon, until completion of a Worst Case Analysis, pursuant to the version of 40 C.F.R. § 1502.22 in force then. The injunction was in response to a BLM proposal to use herbicides to fulfill its statutory duty to control and eradicate noxious weeds on public lands.[2]
Noxious weeds, which have become established on public lands administered by the BLM, reduce and eliminate desirable vegetation from public lands by competing with native plants for water, sunlight, and soil nutrients. The secondary effects of this competition include lower soil quality, increased erosion, and reduced livestock and wildlife yields through the presence of less desirable forage.
On April 10, 1986, the BLM moved to dissolve that portion of the injunction of March 1, 1984 which precludes the BLM from using herbicides to control and eradicate noxious weeds on public lands administered by the BLM in the State of Oregon. *1022 On June 30, 1986, the BLM withdrew its motion of April 10, 1986 and announced that it intended to supplement the final environmental impact statement entitled Northwest Area Noxious Weed Control Program (February 1986). The BLM announced that chemicals would not be used on lands it administered until the Final Northwest Area Noxious Weed Control Program Environmental Impact Statement (FEIS) (December 1985) had been supplemented.[3]
That supplementation was provided in March 1987 when the BLM presented its Final Supplement to the Environmental Impact Statement (FSEIS) for noxious weed control for five states including Oregon. The FSEIS proposes to resume using six herbicide formulations to control noxious weeds: Banvel, Rodeo, Tordon 22K, Tordon 2K, Esteron 99 and DMA-4. These herbicides contain different active ingredients designed to kill or retard the growth of noxious weeds. Banvel's active ingredient is dicamba, Rodeo's is glyphosate, Tordon 22K's and Tordon 2K's is picloram, and Esteron 99's and DMA-4's is 2, 4-D. Each of these herbicides may also contain emulsifiers, solvents, preservatives, anti-volatility agents, and other substances commonly referred to as inerts. (FSEIS at iii.)
Defendants contend that the FSEIS fulfills the requirements of the previous version of 40 C.F.R. § 1502.22 and move to dissolve that portion of the injunction so as to allow the BLM to use products containing the herbicides dicamba, glyphosate, picloram and 2, 4-D to control and eradicate noxious weeds on public lands the agency administers in Oregon. Plaintiffs object to the motion on several grounds.

II. ANALYSIS

A. The Worst Case Analysis Regulation

The "worst case analysis" regulation, 40 C.F.R. § 1502.22, was promulgated in 1979. It is part of the Council on Environmental Quality's (CEQ) comprehensive interpretation of the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. (NEPA). The regulation was amended on May 27, 1986. The current regulation imposes less onerous duties on federal agencies confronting environmental effects or scientific uncertainty about them. Since this environmental impact statement was in progress when the worst case analysis regulation was amended, the BLM may choose to comply with the requirements of either the original or amended regulation. 40 C.F.R. § 1502.22(c) (1986). The BLM has chosen to comply with the requirements of the original regulation. (Memorandum Supporting Motion to Partially Dissolve Injunction at 2-3.) Therefore, I evaluate the FSEIS under the requirements of the original regulation.

B. Standard of Review

NEPA is essentially a procedural statute; its purpose is to assure that, by following the prescribed procedures, agencies will be fully aware of the impact of their decisions when they make them. Trustees for Alaska v. Hodel, 806 F.2d 1378, 1382 (9th Cir.1986). The dual purposes of an environmental impact statement are to provide decision makers with enough information to aid in the substantive decision whether to proceed with the project in light of its environmental consequences and to provide the public with information and an opportunity to participate in gathering information. Citizens For a Better Henderson v. Hodel, 768 F.2d 1051, 1056 (9th Cir.1985).
In reviewing the FSEIS, I am to employ a "rule of reason" that asks whether it contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences. I must determine whether the form, content and preparation of the FSEIS foster both informed decision-making and informed public participation. As a reviewing court I may neither "fly speck" the FSEIS and hold it insufficient on the basis of inconsequential, *1023 technical deficiencies, nor may I substitute my judgment for that of the BLM concerning the wisdom or prudence of its proposed action. Oregon Environmental Council v. Kunzman, 817 F.2d 484, 492 (9th Cir.1987).

C. Adequacy of FSEIS

Plaintiffs attack the adequacy of the FSEIS on several grounds:
1) That they were not included in the scoping process;
2) That the summary of the FSEIS does not adequately and accurately summarize it;
3) That the BLM incorrectly claims the herbicides are safe;
4) That the BLM improperly adopted conclusions of the Environmental Protection Agency (EPA) about the safety of these chemicals; and
5) That the BLM refused to acknowledge errors in its conclusions.

(1) Scoping

The Council on Environmental Quality has developed regulations to implement NEPA. These include a requirement that the BLM is to engage in "scoping" before preparing an environmental impact statement on a proposed action. 40 C.F.R. § 1501.4(d). Scoping is a "process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action." 40 C.F.R. § 1501.7.
It is clear from the CEQ regulations that scoping will be effective only if people who are, or may become, interested in the proposed action are involved. To ensure awareness on the part of such persons, the regulations require the agency to publish a notice in the Federal Register (40 C.F.R. § 1508.22), invite them to participate in the scoping process (40 C.F.R. § 1501.7(a)(1)), and encourage meetings with the public about the impact statement's scope (40 C.F. R. § 1501.7(b)(4)).
Here the BLM published the notice for the FEIS in the Federal Register, prepared and issued a press release explaining that the BLM was considering a program to control noxious weeds, and mailed copies of the press release to organizations the agency thought would be interested in the proposal. However, the BLM did not mail a copy of the press release regarding the FEIS to any of the three plaintiffs in this case or otherwise notify them. Even if I assume this omission was inadvertent, it is hardly hyperbole, however, to call it also inexcusable, given the history of this case. The cavalier attitude of the BLM in Oregon towards the scoping regulations is in sharp contrast to the cooperative spirit recently displayed by the U.S. Forest Service. Were it not for the doctrine of separation of powers, I would seriously consider ordering a review of the policies, procedures and personnel in the Oregon Office of the BLM to ensure this disappointing conduct does not occur again.
While it is difficult to avoid finding that the BLM's conduct violated the spirit of the NEPA regulations, I cannot say it has violated the letter of those regulations, including 40 C.F.R. §§ 1501.7 or 1506.6.
Plaintiffs argue that as "interested persons", under 40 C.F.R. § 1501.7(a)(1), they should have been invited to participate in the scoping process. However, plaintiffs do not say either that they requested notice of this action pursuant to 40 C.F.R. § 1506.6(b)(1) or that they are "national organizations reasonably expected to be interested in the matter" under 40 C.F.R. § 1506.6(b)(2). Indeed, by their very names the plaintiffs' organizations represent a region, a state, and a city, respectively. Vigorous opposition by a local group does not convert a local organization into a national one. Furthermore, plaintiffs show no prejudice as a result of the BLM's failure to invite them to participate in the scoping process since the BLM has considered and rejected plaintiffs' suggestions regarding the scope of the environmental statement.
Plaintiffs suggest the result of the failure to include them in the scoping process was "no alternative was presented in the EIA which discusses control of the causes of noxious weeds, as opposed to merely *1024 treating their symptoms." (Plaintiffs' Response and Opposition to Motion for Partial Dissolution of Injunction at 4.) However, the Northwest Coalition for Alternatives to Pesticides (NCAP) raised this point in a letter to BLM dated February 3, 1986 from Dr. Mary O'Brien concerning the FEIS. (Attachment 5 to the June 24, 1987 Supplemental Declaration of R. Gregg Simmons.) That letter was supplemented by another dated February 6, 1986 from Dr. Mary O'Brien. (Attachment 6 to the June 24, 1987 Supplemental Declaration of R. Gregg Simmons.) Similar thoughts were expressed in a January 4, 1986 letter to Charles Lusher where Dr. Mary O'Brien and Norma Grier commented for NCAP on the draft supplement to the Northwest Area Noxious Weed Control Program Final Environmental Impact Statement. (See FSEIS at 40-51.) The BLM responded to those comments. (See FSEIS at 52-54.)
Having reviewed NCAP's comments and the responses of the BLM, I do not believe the BLM would have proposed the alternative urged by NCAP even if NCAP had been involved in the scoping process for the FEIS. Throughout the process of supplementing the environmental impact statement, NCAP repeatedly urged that the scope be enlarged. The BLM repeatedly refused to do so.
I do not read § 1501.7(a)(1) as mandating invitations to all interested parties. Although the BLM's conduct was short-sighted, if not shabby, it did not violate a literal reading of the scoping regulations.[4] Furthermore, the omission by the BLM was limited to the FEIS. The question of the use of chemicals to control noxious weeds was revisited following the June 1986 announcement of the Department of the Interior. NCAP's attorney was notified of the BLM's intent to supplement the FEIS. I am convinced any error in the scoping process of the FEIS was cured when NCAP was notified of BLM's intent to supplement the FEIS. (Defendant's Reply Memorandum at 10.)

(2) Symptoms Versus Causes

Throughout this proceeding the recurring refrain heard from plaintiffs is that the FSEIS is defective because it addresses the symptoms of the problem without addressing its causes. (See, e.g., Plaintiffs' Response and Opposition to Motion at 7; Narrative Statement of Dr. J. Boone Kauffman at 2 (June 12, 1987); Narrative Statement of IPM Associates at 4 (June 12, 1987).) Plaintiffs want the BLM to resolve the noxious weed problem with an integrated pesticide management (IPM) process that considers the use of herbicides only as the last feasible alternative (Third Narrative Statement of Norma Grier at 6-9) (June 12, 1987) or through altered grazing patterns (Plaintiffs' Response and Opposition to Motion at 9; Narrative Statement of Norma Grier at 3 (May 12, 1986).)
The legal issue facing me is whether the FSEIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences of the proposed actions of the BLM. Kunzman, 817 F.2d at 492. I find the FSEIS does contain such a reasonably thorough discussion. Plaintiffs and the BLM disagree on the best management of our public lands. The BLM has historically and statutorily been charged with management of our public lands. So long as the BLM's decisions are not irrational or contrary to law, it may manage the public lands as it sees fit. Natural Resources Defense Counsel v. Hodel, 819 F.2d 927, 930 (9th Cir.1987). NEPA must not be used as a device to allow interest groups to force their management philosophy on the BLM. If NCAP is dissatisfied with the policy decisions of the BLM, its recourse is not to the judicial branch of our federal government but to the executive and legislative branches.

(3) Use of EPA Data

Plaintiffs argue the BLM has adopted conclusions of the EPA as a basis for statements *1025 about the safety of the chemicals in question, thus violating NEPA. (Plaintiffs' Response and Opposition to Motion at 16.)
The rule in this Circuit is that the EPA registration process for herbicides under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) is inadequate to address NEPA environmental concerns and therefore reliance alone on that registration process is improper. Save Our Ecosystems v. Clark, 747 F.2d 1240, 1248 (9th Cir.1984). The situation in Save Our Ecosystems, was particularly egregious because the EPA data was partial at best, and suspect at worst, because of a testing scandal. Id., 747 F.2d at 1248 n. 13. It has also been recognized that an agency may be required to do independent research on the health effects of a herbicide. Southern Oregon Citizens v. Clark, 720 F.2d 1475, 1480 (9th Cir.1983). Plaintiffs suggest the FSEIS is invalid because the BLM has given consideration and reliance to studies of the EPA. (Narrative Statement of Dr. O'Brien (June 12, 1987).) I reject that suggestion. In Save Our Ecosystems, the Ninth Circuit held a federal agency could satisfy its obligation under NEPA to provide an adequate analysis of the effects of herbicides solely by "appropriately consider[ing] EPA's data on the herbicides in the specific context of the area in which it proposes to spray." Save Our Ecosystems, 747 F.2d at 1247.
Having thoroughly reviewed the administrative record and testimony, I am convinced the BLM's consideration of EPA data was appropriate. The BLM's independent assessment of the safety of the herbicides it proposes to use is substantially different from simply relying on registration under FIFRA. I am satisfied the information relevant to adverse impacts essential to a reasoned choice was known to the BLM, or, where not known, the requirements of the original version of 40 C.F.R. 1502.22(b) were complied with.

(4) Toxological Issue

I group together the remaining concerns raised by plaintiffs in their opposition to the motion to partially dissolve the injunction. These concerns can be summarized as plaintiffs' contention that the BLM incorrectly claims the herbicides are safe.
Plaintiffs have posed the wrong question. The question before me is not whether dicamba, 2, 4-D, picloram and glyphosate are safe, or whether I would permit their use on lands administered by the BLM were that decision entrusted to me. The question, rather, is whether the FSEIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences of the use of these herbicides to control noxious weeds on the public lands in Oregon administered by the BLM. Citizens Against Toxic Sprays v. Bergland, 428 F.Supp. 908, 927 (D.Or.1977).
Plaintiffs' experts, in particular Dr. Mary O'Brien,[5] Dr. Ruth Shearer, and Norma Grier, should be congratulated for their dedication and hard work in pursuit of their goal of pesticide reform. Their contributions are many. However, they ask more than is required by NEPA. It is not necessary that all environmental effects of a proposed action be known. Citizens Against Toxic Sprays, 428 F.Supp. at 922. Nor is an environmental impact statement "inadequate when it fails to discuss remote and highly speculative consequences". Id.
The testimony and witness statements from the experts for plaintiffs and defendants display an internecine toxicological battle. I am not a chemist; I am not expected to be a chemist. I cannot say that one set of experts is clearly more correct than the other; I am not expected to referee an academic dispute. The law is clear: "nor will disagreement among experts about environmental consequences serve to invalidate an E[nvironmental] I[mpact] S[tatement]." Id.
*1026 Plaintiffs may not be satisfied with the FSEIS's substantive recommendation to permit the use of the four herbicides, in view of their assessment of the level and acceptability of the environmental risks. But if the FSEIS meets NEPA's procedural requirements and is not arbitrary or capricious, an informed and deliberate agency decision-maker is entitled to be "arguably wrong." Kunzman, 817 F.2d at 496.[6]

CONCLUSION
I find the FSEIS of March, 1987 fulfills the requirements of the original version of 40 C.F.R. § 1502.22. My injunction of March 1, 1984 is partially dissolved. The BLM is permitted to use products containing the herbicides dicamba, glyphosate, picloram and 2, 4-D to control and eradicate noxious weeds on public lands in Oregon.[7]
IT IS SO ORDERED.
NOTES
[1] Pursuant to Fed.R.Civ.P. 25(d)(1), I order the substitution of Richard E. Lyng for J.R. Block as Secretary of Agriculture.
[2] This statutory duty is found in the Carlson-Foley Act (43 U.S.C. § 1241 et seq.) which authorizes and directs Federal agencies to provide for the control of noxious plants on land under the control or jurisdiction of the Federal Government. The statutory duty is also found in the Federal Noxious Weed Control Act of 1974 (7 U.S.C. § 2801 et seq.) which provides for "the control and eradication of noxious weeds, and the regulation of the movement in interstate or foreign commerce of noxious weeds and potential carriers thereof, and for other purposes."
[3] My March 1, 1984 injunction also enjoined the U.S. Forest Service from spraying herbicides within Region Six. The Forest Service has not moved for dissolution of the injunction. This Order does not change the situation vis-a-vis the Forest Service in Region Six.
[4] Mr. Justice Holmes reminded us that "Men must turn square corners when they deal with the Government." Rock Island v. United States, 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920). The Government, too, must turn square corners when dealing with the People.
[5] During the taking of testimony on July 17, 1987, an objection was made to the qualification of Dr. Mary O'Brien as an expert witness. I have reviewed the Fourth Narrative Statement of Mary O'Brien (July 27, 1987) and I find her qualified as an expert by knowledge, skill, experience, training and education. Her testimony is received under Fed.R.Evid. 702.
[6] In deciding this matter I reviewed, among other items, eight large three-ring binders, chock-a-block full of the Administrative Record and nineteen narrative witness statements filed in lieu of testimony. In addition, in most instances, oral testimony as a witness was received from the person who furnished the statement.
[7] Anticipating an appeal by plaintiffs, I also anticipate a request for a stay, pursuant to Fed. R.Civ.P. 62, of my order partially dissolving the injunction. I would deny that request (employing the analysis required by Lopez v. Heckler, 713 F.2d 1432, 1435 (9th Cir.1983), rev'd on other grounds, 463 U.S. 1328, 104 S.Ct. 10, 77 L.Ed.2d 1431 (1983)). I will, however, stay my order for a period of 30 days so as to allow plaintiffs, if they wish, to seek a stay from the Court of Appeals. Counsel for the federal defendants have submitted a proposed order. I ask counsel for plaintiffs to advise me, within 10 days, if they dispute the form of the proposed order.